First case is Reynaga v. Sun Properties NW, Inc. Good morning, Your Honor. Good morning. May it please the Court, my name is Mary Ann Dugan, I represent the plaintiff and appellant in this lawsuit. I'm going to reserve quite a bit of my time for rebuttal unless there are a lot of questions on the opening, merely because I wrote the last brief and I think it would be interesting to see what the responses to that are. Mr. Reynaga has worked for Sunstead's Mill in Roseburg for over 20 years at this point. For most of that time he has been a millwright. And several years ago, in the late 1990s, he decided that he would like to add to his credentials a journeyman apprentice, a journeyman cart. And he found out that he had to get approval from his employer to do that. So in the facts that came up in Reynaga 1, he went to his employer and they said, no, Mr. Reynaga, we have no business need for that, we've never sponsored a journeyman millwright in the history of this company. And that's what they told this Court on appeal as well in their briefs and in the record. That case was addressed on summary judgment. This Court stated that Mr. Reynaga had presented on appeal, which addressed whether he had presented a prima facie case. This Court said he has not rebutted the company's statement that they have no business need for a journeyman millwright. While that was all going on, about the same time, in 2000, three years after the initial denial of an apprenticeship, Mr. Reynaga went back to his supervisor. He had by that time gotten paperwork from the community college. All that was left to fill out to present it to the apprenticeship board was the employer's signature. And first he was told, no, go away, we're not going to sign that. Then he persisted. He came back. His supervisor said, put in writing what it is you're asking for. He sat down. He typed a letter. He said, this is what I'm asking for. I need an apprenticeship. You need to sign this. That's the only way I can get it. It was passed around between various people and finally sent back to him saying, well, since you're in litigation, we want you to go through your attorney in the future on these kind of things. And we are rejecting your request at this time. We have no business need. In deposition, the human resources supervisor explained, when pressed, why didn't you do this? The evidence that came up was that there actually had been white journeyman millwrights, or white millwrights sponsored for journeyman status for apprenticeships. One or more? The clearest evidence is John Parrish because we have his journeyman paperwork that was processed by Sunstuds. There is evidence that there were more. There were three more. What's unclear is when they got their, when did they get their journeyman cards. We don't have the paperwork showing whether it was processed by Sunstuds. When pressed in deposition, Ms. Gatzke kept stating, it was unclear to us what our commitment would be. We didn't know. We had this big blank form on the back about how much credit he'd get. Can I ask you something? Are there, is there, there's a four-year apprenticeship and then there's a two-year? Well, actually, there's one apprenticeship, and there are two ways of getting it. One is to come in from scratch with no experience and go through the whole program, take all the courses. And that, I believe, is a four-year program. The other way, though, is to get partial credit for your work experience. Mr. Parrish did this. He explained in deposition the maximum you could get. And Mr. Wells, who was the supervisor at the community college of the program, explained that you can get credit for all but your last period. I can't remember. I think it's a one-half-year period. The record is replete with evidence that there was no question that Mr. Renaga was going to get credit for all but the last period. Nobody questioned this. Mr. Parrish explained that nobody questioned this. Mr. Wells, the supervisor of the program, said there was no question that he would get credit for all but the last quarter. The Sunstuds kept trying to claim there were two different programs. There was an upgrade program. Well, this is the upgrade program that he was trying to do. He was trying to get the signature from his employer for the upgrade program. What would the signature mean? What would it obligate the employer to do if it signed the application? Well, the employer, first of all, had signed some paperwork earlier on promising to do an apprenticeship program, by the way. Signing Mr. Renaga's paperwork would commit them to following the guidelines of the apprenticeship program. Now, they claimed- What does that mean? What does it mean practically? Practically, as Mr. Parrish explained, when he did the program, he said, all I had to do was go to work and do my job for 1,000 hours of additional, that last period of time. There was some coursework, which Mr. Renaga had basically already taken care of, almost all of it. And then he did complete all of it quickly. In deposition, there was a claim that, well, we thought maybe he'd have to be supervised by a journeyman, which would have been Mr. Parrish, who was already there. But Mr. Parrish explained he never had to be supervised by a journeyman. He just had to go to work. Does it mean that he would do less work at his job while he was going through this? No, not at all. There's no evidence of that. I guess having turned aside from the question of whether you should have moved to reopen the earlier proceeding, and said, you know, is that from whether this is open? I'm really trying to understand what this is about. Your client wants to become an apprentice. What would the employer have to do to allow him to become an apprentice, other than sign the document saying that he worked for them? What obligation would this place on the employer? Interpreting evidence in favor of the plaintiff, as you must, because this was on summary judgment, absolutely nothing. They would absolutely have to do nothing. And what benefit would there be to the employer? Well, that's certainly, you know, there's a bunch of things that can be argued. Number one, they'd get an employee who has shown that he's committed to being a millwright, that he's gone through the journeyman program, that he's proud of the work. Basically, they'd have an employee who's more attractive to other employers. That could be. Is that an advantage for some products, for properties? That is something that they actually raised below, that we don't want you to leave us. We don't want you to be valuable. We don't want you to increase your credentials. And so they denied him a credential that they gave to a white man. I would like to. Well, that's the allegation, but the problem is you've made that claim before and lost it. Why should you be allowed to make the claim again? Your Honor, in Frank, which I would argue is the most, the closest case on point, there's two reasons. Number one, the Frank court stated clearly a claim arising after the date of an earlier judgment is not barred, even if it arises out of a continuing course of conduct that provided the basis for the earlier claim. But is the issue barred? Is the issue barred? The issue is, did they, they can't immunize themselves in perpetuity from a claim of discrimination by saying back in 97. They can't immunize themselves in perpetuity. If you could show that after the last decision, they then allowed a white person to take the program and denied it to a Hispanic, you would have a new claim. The question, whether you're barred from, are you barred from relying on the fact that they had discriminated prior to the time of the judgment? We're not arguing about the discrimination that occurred prior to the judgment. You are saying that they let Mr. Parrish do it before the last judgment. We're presenting that as evidence. We're not saying that that's part of, that's not the new claim. The new claim is that they stated they weren't sure what their obligations would be. That's when they were pressed for an explanation. That was the reason they gave. We have no idea what our commitment would be. All they had to do was ask Mr. Wells and Mr. Parrish, what would the commitment be? This is a person who had gone through the program and the head of the program. And they would get a clear answer, nothing. You let the guy come to work, you sign the paperwork, and he will get credit. And he will become a journeyman. The Frank court addressed both timing, a claim arising after the date of the judgment, and it addressed the giving of a new policy or the production of a new policy. Those were two things upon which Frank was faced. We have both of those here. The employers ---- What's the new policy? The new policy is, oh, well, now that you've caught us in the fact that we do have a business need, or else why would we have let Mr. Parrish do it, we ---- Well, where's the logic in that? Where's the business need? Well, why did they let Mr. Parrish do it? This is a question for the jury. Maybe somebody felt like being a nice guy that day, but that doesn't establish business need because you can't establish business need for your clients. This is a question for the jury, Your Honor. We are not at that stage yet. Mr. Miyaga only has to present a prima facie case. I see I'm out of time. If I could have one or two ---- We'll give you a couple of minutes for rebuttal. Thank you, Your Honor. If I could please the Court, my name is Amy Alford, and I represent the appellees in this matter. For clarification, there were two individuals in 1972 who received letters from the JATC. Could you speak a little louder? Is that better? That's better, yes. There were two individuals in 1972 who applied for and apparently participated in the program. What the record reflects is that there was simply a letter sent to those individuals' homes indicating that they had attained journeyman status. Was one of those Mr. Parrish? No. Mr. Parrish was a 1992 recipient of the journeyman apprenticeship status, and his affidavit, which is also in the record, demonstrates the business need for his particular participation in that program. What happened in 1992 is that the hydraulics mechanic retired, and the company found itself without an individual trained in hydraulics. As it happened, the hydraulics courses that Mr. Parrish needed to take when he was promoted to fill that position were also courses that matched the requirement under the JATC apprentice to journeyman program. So he was permitted to go through that program, as stated in his affidavit, because there was a business need at that time in 1992 to have somebody learn the hydraulics piece of the business operation. May I ask you about the plaintiffs here? Other than signing the piece of paper, counsel says that this would have cost the company nothing. It would not have interfered with his work. He just wanted to prove himself, and the company said, we don't want you to prove yourself. If you'd signed this paper, would this have somehow inconvenienced the company? Yes. There are two problems with going through the apprenticeship program in Mr. Bernaga's case for the company. The first is, in order to sponsor an individual, the employer has to fill out the paperwork saying, we agree to be a sponsor. Then that individual goes before the JATC committee, and at that point a decision is made as to whether that individual will get credit for all or part of his or her prior on-the-job experience, because there's an 8,000-hour equivalent to four-year requirement. Now, granted, Mr. Bernaga may have ultimately received credit for all or part of that, but you don't know as an employer when you sign the paperwork what the commitment will be. And what difference does it make whether he does or doesn't? The difference is that you have to, as an employer, sign on to, and I'm looking at the supplemental excerpt of record at page 105, duties of an employer. The employer must comply with the provisions of these standards and any agreement applicable to the sponsor's program. The employer, on forms approved, must make regular reports to the appropriate apprenticeship committee. In addition, the individuals who take this program take a number of classes, and sometimes those classes are offered at times that are convenient for the employer, and sometimes they are offered at times that conflict with the employee's work shift. As an employer, if you agree to sign on to the sponsorship, you may be agreeing to have your employee in class during your business hours. What the company did instead is it had a tuition reimbursement program, and the reason that that made sense for this employer is it's a class-by-class basis. You want to take a hydraulics class, even though it happens to be in the program, bring us the form to show us the time the class meets. If it interferes with your work schedule, we'll make a determination whether during this block of time we can accommodate that. And in Mr. Ranaga's case, he took five hydraulics classes, and in each case he was permitted to arrive at work two hours early and leave work two hours early. But the employer was able to accomplish that on a class-by-class basis. Can the employee ever get the apprenticeship work experience portion through that program? Well, the work experience is the on-the-job training. I'm not sure that there's anything unique about the training. He was already doing millwright work. But he can't get certified for it, presumably, unless he goes through the program, and to do that he needs an employer to act as the supervisor for that. So he's kind of stuck. He gets to take the classes to educate himself, but he can't do anything to get the certification unless the employer signs on. That's correct. He cannot get the journeyman card, which has no use within a company that does not have a unionized workforce. The journeyman status for that company doesn't mean anything except that it's training its employees and qualifying them to go to work. Well, if the company went out of business, he would be a far more marketable employee if he had a journeyman's card. He would probably be more marketable for those employers who acquired journey status for their millwrights. So that means he would have more opportunities for employment. That's true. And the fact is the company sold its operation. Mr. Renaga was retained in the same position with no loss of status. And the new company that took over, he wasn't penalized because, of course, all of the employees at Sun Studs, except for Mr. Parrish, were in the same situation that he was. They didn't have cards. Here's the question I have, Ms. Alpert. He makes his first request. He's turned down, and the court finds that there's a legitimate reason for that turndown, basically. It seems to me it's not inconceivable that when he applies again, they may or may not have a good reason the second time to turn him down. I mean, they may have turned him down the first time for a good reason and turned him down the second time for a bad reason. Isn't that possible? If they turned him down the second time for a bad reason, for example, if they allowed additional people into the program under circumstances that would be similar to his application, I would agree with you that at that point the issue would have changed because other individuals who were not Hispanic, presumably, would have been permitted into the program. The problem with the plaintiff's case here is that the issue in the first case, and I'm reading right out of the plaintiff's complaint in the first case, is beginning in 1997 and in 1998, plaintiff made requests to defendant to be given an opportunity to attend school so he could obtain a journeyman license. Defendant offered such an opportunity to employees who were white, but denied plaintiff the same opportunity. In the current lawsuit, the allegation is, in refusing to sponsor plaintiff for the apprenticeship program, defendant treated plaintiff differently from other persons outside his protected class. That issue is identical to the issue in the first case. Well, it wouldn't be identical if the employer treated him differently after the last complaint. If after the last complaint you allowed 20 white employees to become journeymen and you said to him no, that issue wouldn't be large. I would agree with you. They don't the problem. It comes down to the fact that the problem is that the discrimination or the proof of the discrimination he's relying on are events that occurred before the first judgment. Well, there are two problems, and that's the first problem. If the appellant believed that somehow there was new evidence or that evidence somehow would have furthered his claim, the appropriate remedy would have been to bring a Rule 60B motion to amend the judgment. At the point time when plaintiff claims to have learned, appellant claims to have learned of this evidence, the district court had just granted summary judgment in Sunstud's favor in the first case. So he still had an opportunity to bring that 60B motion. There is no evidence in the record why that did not occur, but there are only two possibilities. Either it was considered and deemed to be a less favorable procedural route because by bringing a new lawsuit, of course, there was an opportunity to make new discovery requests, which is what happened, to take new depositions and to try to compare the deposition testimony, which is what happened, and to try to relitigate the issue. Instead of following the procedure in the rule that says, if you think you have newly discovered evidence, this is the procedure you must follow. I don't know the rationale. I do know that the plaintiff, excuse me, the appellant, appears to have benefited from its procedural, the manner in which it's proceeded through this court system now twice. Can I ask you another question? Is there any dispute about your statement that you would be compelled to let him off at the hours the courses were scheduled? Is that an absolute agreed-upon fact, or is that subject to dispute, whether he could just say I'm not coming to work on Tuesdays because that's when the courses are? Well, the apprenticeship program has a guidebook, and the guidebook is in the record, and it says employees, employers must comply with the program. There's nothing in the record that says what happens if there's a class right in the middle of the shift. But the employer's concern was twofold. One, this isn't a program that makes sense to us. We have tuition reimbursement. And two, we don't know what our commitment looks like or is going to look like, and rather than enter into a commitment that doesn't benefit us and that we don't know what it looks like, we are going to follow our tuition reimbursement, and Mr. Renaga benefited from that. Why is it you didn't follow the tuition reimbursement with Mr. whatever his name was? Parrish. Mr. Parrish. At the time, Mr. Parrish himself requested to get the journeyman card, and Lee Gatzke testified in her deposition that it was her understanding at that time that in order for him to take those classes, Sunstuds had to sign that sponsorship. She later found out that that wasn't true. But in 1992, Sunstuds was faced with a predicament of an empty vacancy in the hydraulics and a person who was willing to take the courses who the company wanted to promote. So there was a business need then. Lee Gatzke testified. There wasn't a business need. There was a mistake. A mistaken thought that there was a business need. There was a business need for the classes, yes. There was a mistaken belief on Lee Gatzke's part that she had to sign that paperwork in order to allow him to take the classes. That's correct. And that, of course, would have been developed on a 60-B motion or would have been discovered in the first case had she been asked those questions or had those documents been requested. That didn't happen, and instead I'm standing before you with an implication that somehow Sunstuds either hid evidence or, worse yet, was not forthright with the court when, in fact, the documents were not requested and Lee Gatzke was not asked in her deposition why Parrish participated in the program in a manner in which Mr. Vernaga was not permitted to do so. All right. Thank you. Thank you. Thank you. Thank you for offering me rebuttal time. There's a couple of red herrings here. One is the issue of reopening the first case. As the court cases make clear, it's virtually impossible to reopen a judgment, and that's not what's at issue here. We didn't try to do that, and that's not what we're trying to do. In this appeal, it is the plaintiff's, it is the defendant's burden. Well, isn't it your theory that there was evidence that would have changed the first judgment? That is one. And you discovered it right after the judgment? That is one approach that could have been taken. That is not what's at issue in this case. Another red herring is the business need issue. The business need issue has never been squarely before this Court in Reynaga 1 or 2. In Reynaga 1, this Court was addressing an appeal of a decision that Mr. Reynaga had not met his prima facie case. He had not shown that there had been an adverse employment decision and that he had been treated differently from other people. This Court never addressed the merits of the business need issue. That is a jury question. The result below cannot be harmonized with Frank. In Frank, the Court addressed both claim preclusion and issue preclusion and stated that claims arising after the initial judgment cannot preclude, cannot be precluded by that judgment. Now, in Frank, the situation was even clearer because there actually was a judgment. There was a settlement on the merits in that case. Here we have a summary judgment appeal in Reynaga 1 on whether there was a prima facie case. The burden had never shifted to the employer in Reynaga 1 to prove business need. I have to ask you to stop. Yes. Because what you said about our first decision did not square with my recollection. I'm looking at the First Ninth Circuit. The wording is — It says, although Sunstuds has sponsored journeyman schooling for electricians, Sunstuds argues it has a business need for a journeyman electrician but not for a journeyman millwright, and that it was for this reason alone it did not approve Reynaga's request. Reynaga introduced no evidence to discredit this assertion. Now, I can hear a distinction that says, well, yes, the Court didn't have to say that, but we plainly did say that. It's included within the first decision. In a summary judgment stance where he was unable to prove that he had been treated differently from white employees, which is part of his prima facie case. I agree that the wording of Reynaga 1 talks about business need. My point is that issue was not before the Court. Well, it's not our habit to say things for the heck of it. I don't think you can disregard it quite so easily. Yeah. Well, I still think that if you look at Frank, though, this case is not, it cannot be harmonized with that decision. On the Gadsky issue, Ms. Alpern, and I say I'm out of time. I'm sorry if I could just complete my thought. She stated, defense counsel stated that Ms. Gadsky was never asked, did you sponsor any white people? She came out and stated in an affidavit, which was presented to this Court, that they had never sponsored a journeyman millwright. These are not identical issues. They can't be identical because there were different requests three years apart. And therefore, under Frank and the other case law, the claim for issue preclusion cannot apply. Thank you, Your Honors. This disarguably submitted. The next case on the calendar is Castillo-Castellanos-Garcia v. Ashcroft.
judges: Reinhardt, Silverman, Clifton